RONALD S. EDDINGTON, IDOC #110732
Saguaro Correctional Center  LC 13
1252 E. Arica Rd.
Eloy, Arizona 85131

Representing himself, Pro Se

U.S. COURTS

DEC 1 8 2020

Rcvd_____Filed_____Time_____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RONALD S. EDDINGTON,<br>　　　　Plaintiff<br><br>v.<br><br>Governor Brad Little, in his official and<br>individual capacity; Idaho Broad of<br>Corrections Chairman Dr. David McClusky,<br>in his official and individual capacity; IDOC<br>Director Josh Tewalt, in his official and<br>individual capacity; Idaho Department of<br>Corrections,<br>　　　　Defendants. | Case No. 1:20-CV-574 BLW<br><br>CIVIL ACTION<br><br>JURY TRIAL DEMAND |

## COMPLAINT

Plaintiff Ronald Eddington complains against Defendants, Idaho Governor Brad Little in his official and individual capacity; Idaho Board of Corrections Chairman Dr. David McClusky in his official and individual capacity; IDOC Director Josh Tewalt in his official and individual capacity; and the Idaho Department of Corrections.

### I.　　PARTIES

1. Plaintiff, Ronald Eddington (hereinafter "Ron") is an individual who is currently and was at all relevant times herein a resident of the State of Idaho who was incarcerated in Eagle Pass, Texas, and transferred to Eloy, Arizona.

1

2. Defendant, Idaho Governor Brad Little (hereinafter "Gov. Little") is an individual who is currently and was at all relevant times herein a resident of the State of Idaho and may be served with process at P.O. Box 2664, Boise, Idaho 83701.

3. Defendant Idaho Board of Corrections Chairman Dr. David McClusky (hereinafter "Chairman McClusky") is an individual who is currently and was at all relevant times herein a resident of the State of Idaho and may be served with process at 1299 N. Orchard St., Suite 110, Boise, Idaho 83706.

4. Defendant, IDOC Director Josh Tewalt (hereinafter "Director Tewalt") is an individual who is currently and was at all relevant times herein a resident of the State of Idaho and may be served with process at 1299 N. Orchard St., Suite 110, Boise, Idaho 83706.

5. Defendant, Idaho Department of Corrections (hereinafter "IDOC") is a governmental entity of the State of Idaho and may be served with process at 1299 N. Orchard St. Suite 110, Boise, Idaho 83706.

## II.  JURISDICTION

6. Jurisdiction is based on the Civil Rights Act, 42 U.S.C §1983, and the amount in controversy.  Plaintiff was subjected to cruel and unusual punishment in violation of the Eight Amendment.  The amount in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand ($75,000) dollars.

## III.  FACTS

7. On August 18, 2020, 148 Idaho inmates, including Ron, are transferred from Eagle Pass, Texas, to the Saguaro Correctional Facility located in Eloy, Arizona.

8.  At time of the transfer from Texas, the COVID-19 virus was spreading unabated throughout the United States, and the world, creating a public health emergency unprecedented in living memory.

9.  The current widely reported medical evidence at the time of transfer stated the COVID-19 risks of serious complications or death are highest for offenders over fifty and those with certain pre-existing medical conditions, but it can be serious for younger people and those in good health. (Linda So & Grant Smith, In Four U.S. State Prisons, nearly 3,000 Inmates Test Positive for Coronavirus, REUTERS (April 25, 2020).

10. Because of massive overcrowding in Idaho's prison system, the state contracted with the GEO Corporation in 2018 to house over 600 inmates in a prison facility located in Eagle Pass, Texas. This contract was set to expire on October 1, 2020. Subsequently, Idaho contracted with the CoreCivic Corporation to house over a thousand inmates in two Arizona prison facilities.

11. On March 25, 2020, Idaho Governor Brad Little issues a state-wide stay at home order for all Idahoans due to the spread of COVID-19.

12. On April 3, 2020, Director Tewalt, in an email to inmate and staff states, "We've been seeing rumors fly on social media about plans to move people to out-of-state facilities during the health crisis. That's simply not true."

13. On May 8, 2020, a federal class-action suit charged that CoreCivic detainees in its Florence facility in Arizona were denied medical care and the most basic safeguards in dealing with the COVID-19 pandemic. The Florence Correctional facility is set to hold a portion of the Idaho inmates.

14. On May 22, 2020, IDOC Constituent Service Manager Ammie Mabe, in an email, states, "We are moving forward with a contract, but with COVID and the travel ban, it has been extremely difficult to get things done."

15. In a May 23, 2020 email, Manager Mabe states, "In the contract with GEO, we have the option to extend it month to month."

16. On July 2, 2020, Director Tewalt, in an email to inmates and staff states, "I want to share with you what we have learned from other systems who have battled COVID at the onset of the pandemic. It is widely believed that in the public at large, significantly more positive cases exist where people never develop symptoms or experience complications… For our system, we are going to keep testing as many people as possible to try to identify everyone who is positive, regardless of symptoms."

    "Here's why that is important, we have to identify positives so we can do contact tracing to identify people who might have had close contact with those positive individuals. Then we quarantine and keep testing. The strategy for battling COVID in the community is the same as it is in prison. Test, Trace & Quarantine."

17. In an August 8, 2020 email, Contract Prison Oversight Manager Tim Higgins states, "We will comply with all Center of Disease Control standards during the transfer of the inmates, either to the out-of-state facility in Arizona or back to Idaho."

18. Next door to Arizona, in the state of New Mexico at the Chibola County Correctional Center, CoreCivic is accused of ignoring a COVID-19 outbreak, putting inmates, staff and the community at risk. A New Mexico congressional delegation, made up of Senators Tom Udall and Martin Heinrich and Representatives Deb Haaland, Ben Ray Lujan and Xochitl Torres Small, expressed concerns about the prison's handling of COVID-19 in an inquiry

on August 14, 2020. CoreCivic took too long to realize that it had "a massive outbreak in its facility endangering the safety of inmates, detainees, staff and the community", the delegation wrote in a letter to U.S. Immigration and Customs Enforcement (ICE), USMS and CoreCivic CEO Damon T. Hininger. The letter noted that the state Department of Health had to direct CoreCivic to conduct mass testing, a point of concern. The delegation was also concerned that "correctional officers working at the Chipola facility are not wearing PPE when escorting COVID-19 positive inmates into the local hospital", the letter said. Even before the COVID pandemic, the prison had a reputation for dismal medical care. "The Chibola facility has long been known to be one of the most problem-prone prisons in the nation", the U.S. Dept. of Homeland Security wrote in a December 2016 report. (NM Political Report, private prison operator Core Civic is accused of ignoring a COVID-19 outbreak..., by Amy Martyn, Searchlight, New Mexico.)

19. In an email to his staff dated August 18, 2020, and posted online, Defendant Director Tewalt states, "Late last week we finalized a contract with Core Civic for out of state placement at the Saguaro Correctional Center in Eloy, Arizona. Earlier today, the first group of 148 gentlemen were transferred from Eagle Pass, Tx to Saguaro without incident."

20. In the same email, Director Tewalt states, "In Eagle Pass, Tx, 24 tests have been conducted with 17 testing negative, 4 positive and three tests are pending." He also delineates that in Idaho state prisons, 5,121 COVID tests have been conducted with 1,158 positive cases rendered.

21. At the time of transfer from Eagle Pass, Texas, to Eloy, Arizona, both states were grappling with out of control COVID-19 spread and the COVID virus had become the third leading cause of death in the U.S.

22. Shortly after midnight on August 18, 2020 at the Eagle Pass Correctional Facility, the inmates of A2 block, including Ron, were informed to roll up their bunks and prepare for transfer to Arizona.

23. With all inmates wearing masks, they were assembled in a hallway just outside the intake area of the prison. There they waited, side by side, for two to three hours before entering intake to prepare for the Arizona transfer.

24. The CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities states under "Operations" – "Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release), unless necessary for medical evaluation, medical isolation/quarantine, health care, extenuating security concerns, release, or to prevent overcrowding."

25. While waiting in the prison hallway, IDOC Contract Prison Oversight Unit Representative Monte Hansen stepped in to talk with the inmates. Mr. Hansen was specifically asked why the inmates had not been tested for COVID-19 prior to this transfer. Mr. Hansen was initially evasive but at one point stated the decision must have been made not to test but that he did not know the reason. This response was witnessed by multiple inmates. He then excused himself and was not seen again by Ron until his arrival at the Saguaro Correction Center later that day.

26. Per CDC guidelines in effect at the time of transfer, under "Social Distancing" – "Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. People who have been infected with SARS-COV-2 but do not have symptoms can still spread the infection, making social distancing even more important."

27. Upon entering intake and throughout the process of preparing for transfer, as well as throughout the actual transfer, there was no attempt to conduct social distancing or even minimize contact between inmates and staff.

28. Shackles were placed on each inmate and then they were shackled together by twos. While shackled together, the inmates were unable to move more than a few inches from each other. The inmates were then tightly packed on the transfer buses for the trip to the airport. Each of the bus's windows were sealed shut, allowing air to recirculate throughout the interior. In this manner, the three-hour trip to the airport was accomplished.

29. The CDC guidelines for "Transporting Individuals with Confirmed and Suspected COVID-19 and Quarantined Close Contacts" – "If the transport vehicle is not equipped with the features described in the EMS guidance, at a minimum, drive with the windows down and ensure that the fan is set to high, in non-recirculating mode. If the vehicle has a ceiling hatch, keep it open."

30. At the airport, the inmates, including Ron, were unloaded from the buses, and shackled together in threes and, again, were tightly packed on the airplane bound for Phoenix, Arizona. At the Phoenix airport, the inmates were re-shackled in twos and, again, tightly packed on a bus and driven to the Saguaro Correctional Center in Eloy, Arizona. Once again, the windows on the bus were sealed shut.

31. Upon arrival at the Saguaro facility, the buses were parked, and the inmates waited two to three hours on the buses before being unloaded and unshackled for processing in the Saguaro facility.

32. The CDC guidelines regarding "Operational Preparedness – Communication and Coordination" states, "Develop information sharing systems with partners. Create and test

communication plans to disseminate critical information to incarcerated/detained persons staff, contractors, vendors, and visitors as the pandemic progresses."

33. During processing into the Saguaro facility, several staff members were asked why there was such a long wait on the buses before the inmates were allowed to unload and enter the facility.  The inmates, including Ron, were told that the processing staff were unaware that the Eagle Pass inmates were coming and were unprepared.

34. At a processing station, for reasons not explained, inmates, including Ron, were required to put their chins directly on a table, then place the right side of their face followed by the left side of their face directly on the table.  Ron witnessed no cleaning of the table surface between inmates.  Ron asked the staff member what this was for and why they were not cleaning the table and was informed to move on to the next station.  At the next station, Ron asked what the previous station was for and was informed it had something to do with security.  Because of this security check, multiple inmate's faces touched multiple inmates faces in the midst of a pandemic, and with no regard for CDC guidelines.

35. During the Saguaro intake process, Ron saw Idaho Representative Monte Hansen talking with several administrative staff members in the intake area.  Mr. Hansen would have overseen the processing of the Idaho inmates.

36. COVID-19 testing was conducted on all inmates, including Ron, during the intake process at the Saguaro facility.

37. All inmates, including Ron, were assigned two-man cells to begin the quarantine process. With no prior testing done at Eagle Pass, this was done without any knowledge or regard for who was positive.

38. On August 28, 2020, medical personnel came to LC tier, where Ron was living. Visits were made only to select cells on the tier to inform the inmates who tested positive. An inmate in cell LC14 was informed that he had tested positive for COVID-19. This cell was next to Ron's cell LC13. Despite the fact the other inmate tested negative, the positive inmate, after being informed, was left in cell LC14 until August 31, 2020, as were all the other inmates who tested positive left in their cells. On the 31st, all inmates who tested positive were moved into two-man cells on LC tier with other inmates who tested positive.

39. This move, three days after medical personnel, as well as the facilities administration, and the IDOC would have been aware of the positive tests, left multiple cells with one inmate in them. At the time of this move, which was conducted and overseen by the LC tier Unit Manager, inmates who were residing in top bunks but had requested bottom bunks were allowed to move into the newly vacated bottom bunks formerly occupied by COVID-19 positive inmates.

40. The Unit Manager informed Ron's cellmate, who had requested a bottom bunk, that he could now move into the bottom bunk of the cell LC14. Ron's cellmate inquired if there was going to be any retesting of the inmate left in cell LC14. The Unit Manager did not respond to this but reiterated that if he did not move now, he would not be given a bottom bunk. Ron's cellmate declined out of concern for his health.

41. Per CDC guidelines, under "Quarantining Close Contacts of Individuals with COVID-19" – "If the close contact is tested for SARS-COV-2 and tests positive for SARS-COV-2, the individual should be medically isolated rather than quarantined." "Testing is recommended for all close contacts of persons with SARS-COV-2 infection, regardless of whether the close contacts have symptoms... Facilities should make every possible effort

to individually quarantine cases of confirmed COVID-19, and close contacts of individuals with confirmed, or suspected COVID-19.  Cohorting should only be practiced if there are no other available options."  "…avoid mixing individuals quarantined due to exposure to someone with COVID-19 with individuals undergoing routine intake quarantine."

42. In the hallway and intake area of the Eagle Pass Correctional Facility, there were video cameras that recorded the events of August 18, 2020.  In the buses that transported the inmates from Eagle Pass to the airport there were video cameras that recorded the events of August 18, 2020.  In the Saguaro Correctional Center there were video cameras throughout the Lima Units that recorded all events from August 18, 2020, and all other events stated in this complaint.

43. On September 8, 2020, in a phone call with Ron's mother, LC Unit Manager D. Sigmon states that there would be no further COVID-19 testing of inmates.

44. On September 9, 2020, Ron sent a Health Services Request form and asked to be retested for COVID-19.  Ron also sent a concern form to the LC Unit Manager requesting to be retested for COVID-19.

45. On September 10, 2020, IDOC Contract Prison Oversight Unit Representative Monte Hansen, in an email states, "At this time, we will have a monitor at the facility weekly.  In addition, the monitor and the IDOC medical team are updated regularly on the COVID status of the inmates at the facility".

46. On September 18, 2020, Ron met with Saguaro Medical Dr. Nale for his chronic care evaluation regarding high blood pressure.  At this meeting, Ron inquired about his desire to be retested for the COVID-19 virus.  Dr. Nale stated that all inmates who tested negative from the August 18th testing would not be retested unless they were to exhibit symptoms

of COVID. This statement was made by the medical doctor despite the facts known at the time that 40% of people infected with COVID-19 could be asymptomatic.

47. On September 25, 2020, having not received any response from either Medical Services or the Unit Manager, Ron inquired about filing a grievance, but was informed by the LC Case Manager that there were no grievance forms available at this time. Ron was also informed by several inmates that they had not been able to acquire grievance forms because of availability issues. In the Saguaro Correctional Center Idaho Inmate Handbook under Grievance/Appeal Procedure states, "The decision of the Warden is final and terminates the inmate grievance procedure,…" Ron, on September 25th, sent a concern form to Warden Frink requesting to be retested for COVID-19 due to the number of positive tests resulting from the August 18th testing and Idaho and the Saguaro facilities disregard of CDC guidelines in the management of the positive inmates in quarantine, as well as the disregard of CDC guidelines during the transfer from Texas to Arizona.

48. On October 20, 2020, Ron received an answer to his concern form to Warden Frink dated September 25, 2020 some 25 days after it was sent. The reply states, "Warden Frink will no longer be answer request (sic) here at Saguaro." Despite the importance of the request in the concern form neither Deputy Wardens at Saguaro chose to respond to Ron's request. Nor did Ron ever receive a response from Saguaro Medical Services, or the Lima Unit Manager regarding this issue.

## CLAIM FOR RELIEF

### IV.   FEDERAL CLAIM

49. To prevail on a 42 U.S.C. §1983 claim "a plaintiff must show that (1) acts by defendants (2) under color of state law (3) deprived him of federal rights, privileges or immunities and

(4) caused him damages." <u>Thorton v. City of St. Helens, 425 F.3d 1158, 1163-74 (9th Cir. 2005)</u>.  In addition, a plaintiff must allege that he suffered a specific injury as a result of the conduct of a particular defendant, and he must allege an affirmative link between the injury and conduct of the defendant.  See <u>Rizzo v. Goode, 423 U.S. 362, 371-72,, 377 (1976)</u>.

<u>VIOLATIONS OF THE EIGHTH AMENDMENT</u>

50. Eighth Amendment standards require a showing of a substantial risk of serious harm and deliberate indifference to that risk.  <u>Farmer v. Brennan, 511 U.S. 835, 833, 114 S. Ct. 1970, 128 L. ED. 2d. 811 (1994)</u>.  The United States Supreme Court has held that inmates who were crowded into cells with those who had infections maladies such as hepatitis and venereal disease, that this was one of the prison conditions for which the Eight Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately, and even though the possible infection might not affect all of those exposed.  <u>Hutto v. Finney, 437 U.S. 578, 682-83, 98 S. Ct. 2565, 2569, 57 L. Ed. 2d. 522 (1978)</u>.  In <u>Helling v. McKinney</u>, the Supreme Court held that the Eighth Amendment protection would be available even though the effects of the exposure to the plaintiff's health might not be manifested for some time.  <u>Helling, 509 U.S. 25, 35, 113 (1993)</u>.

51. Ron has stated a cause of action under the Eighth Amendment showing that all defendants, with deliberate indifference, failed to keep him reasonably safe from exposure to the COVID-19 virus that poses an unreasonable risk to his current and future health.

52. An official act with "deliberate indifference...only if the [official] knows of and disregards an excessive risk to inmate health and safety."  <u>Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1187 (9th Cir. 2002)</u>.  Under this standard, the official must not only "be aware

of the facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970 128 L. Ed. 2d 811 (1994). This "subjective approach" focuses only "on what a defendant's mental attitude actually was". Farmer, 511 U.S. at 839, 114 S. Ct. 1970.

53. As Ron has shown in great detail in this complaint, Gov. Little, Chairman McCluskey, Director Tewalt, as well as IDOC officials were very clearly aware that COVID-19 posed a serious risk to the Idaho inmates health. This is shown in Gov. Little's March 25, 2020 state shutdown order. It is shown in the Board of Corrections online BOC meeting agenda for July 20th and 27th, 2020, in which Chairman McClusky presided over and states, "Due to social distancing requirements and physical space limitations, participation via Zoom is strongly recommended. Anyone wishing to attend the meeting in person will need to arrive 15 minutes early and will be subject to the Idaho Department of Correction medical screening for COVID-19, to include a non-contact temperature check prior to entry and wearing a cloth face mask will be required. Anyone may be denied entry based on the results of the screening or refusal to follow social distancing or mask requirements." It is shown in Director Tewalt's multiple emails regarding the COVID pandemic in Idaho prisons and the IDOC's response. It is shown in Contract Prison Oversight Manager Tim Higgins email where he states, "We will comply with all Center of Disease Control standards during transfer…" It is shown in IDOC Constituent Services Manager Ammie Mabe's emails stating, "We are moving forward with a contract, but with COVID, and the travel ban, it has been extremely difficult to get things done." And especially in Mabe's email stating, "In the contract with GEO, we have the option to extend it month to month,"

showing IDOC's awareness that they could choose to delay the transfer until such time as the pandemic was considered under control and CDC guidelines agreed with that decision. Awareness is shown in IDOC Representative Monte Hansen's discomfort and ambiguous response to why all inmates at Eagle Pass, Texas, were not tested for COVID-19 prior to transfer to Arizona.

54. Deliberate indifference also requires an objective component. As Director Tewalt explained in his August 18, 2020 email, "Late last week we finalized a contract with Core Civic for out of state placement at the Saguaro Correctional Center in Eloy, Arizona." It is reasonable to infer that "late last week" would be Thursday, August 13, or Friday, August 14. This compressed window of four days included Saturday and Sunday which may have further limited the planning and logistical process.

55. Despite the need to protect the Idaho inmates from COVID-19 through thorough pre-planning, the inmate transfer reflected this complete lack of preparation and deliberate indifference to the risks involved. There was no testing of the Texas inmates prior to the transfer to Arizona, therefore, Idaho had no knowledge of who was or was not positive. With inmates shackled together and grouped together there could be no social distancing, Thus, the infection of inmates during transfer was a reasonable probability.

56. These policy decisions were made at the highest levels by those personally responsible for oversight of the out-of-state inmates. Per the IDOC website Organization Chart this would be Defendants Gov. Little, Chairman McClusky and Director Tewalt, with this policy decision being carried out by the IDOC. The Board of Correction meeting agenda for July 27, 2020, has listed as #8; Action Item – Out of State Placement. In addition, listed as #13; COVID-19 Update, presented by Director Tewalt. These facts show the defendants

14

involved in the deliberation and decision-making process involving the out-of-state inmates as well as the impact of the COVID-19 pandemic. A claim has facial plausibility when the pleaded, factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Bell Atlantic Corp. vs. Twombly, 550 U.S. 556 (2007). The Supreme Court has held "that state officials, sued in their individual capabilities, are "persons" within the meaning of 1983. The Eleventh Amendment does not bar such suits, nor are state officials absolutely immune from personal liability under 1983 solely by virtue of the "official" nature of their acts." Hafer v. Melo, 502 U.S. 21, 31 (1991).

57. From shortly after midnight of August 18, 2020, in Texas, until the inmates arrived at Saguaro and through the intake process, the only CDC guideline that was followed was the wearing of masks by the inmates and staff. The facts show that all other CDC guidelines were completely disregarded with deliberate indifference to all inmates, including Ron's safety and health.

58. It is clear from the IDOC Representative Hansen's email that IDOC is updated on a regular basis and is a weekly presence at the Saguaro facility. The IDOC thus has the stated ability and obligation to oversee, review and scrutinize all aspects of Saguaro's management of the Idaho inmates during quarantine. This shows awareness of the number of positive COVID-19 tests, as well as the need, per CDC guidelines, to retest. Significantly, the positive inmates, and Saguaro's disregard of CDC guidelines to isolate these inmates immediately and retest their prior cohorts or even protect the rest of the inmates from these cohorts would have been overseen by IDOC. Director Tewalt's July 2, 2020 email shows that he, very clearly, understands the CDC guidelines and the necessity for testing, contact

tracing, and quarantining of inmates.  In addition, Idaho officials as shown, had multiple, clear examples of CoreCivic's consistent disregard for protecting its inmates from COVID-19.  These examples include the federal class-action suit filed on May 8, 2020 in regard to the Arizona Florence facilities' handling of the COVIC-19 outbreak.  Idaho even contracted to place a portion of its inmates in this facility despite the clear warnings of doing business with a company that has a record of perpetuating medical neglect.  And in Arizona's neighbor state of New Mexico where CoreCivic's handling of a COVID-19 outbreak in the Chibola facility was so concerning that it brought about an investigation from the state's U.S. Senators and Representatives on August 14, 2020.  Add to this, Idaho's own troubled history with CoreCivic when it operated the Idaho Correctional Center.  Idaho took over the facility after years of documented misconduct leading the FBI to investigate the violence, understaffing and the falsifying of records to cover up misdeeds at the prison.  All of these readily available facts from before the transfer to Arizona shows the defendants deliberate indifference to their responsibility to keep the Idaho inmates, including Ron, reasonably safe from contracting the virus.

59. Because of the lack of testing in Texas prior to the transfer and because of the lack of follow-up testing after the August 18th arrival in Arizona, there is no way for the defendants to know who was infected during the move or after the August 18th mass testing of the newly arrived inmates, especially those cohorted or in close proximity to those who tested positive.  All of this is in disregard to CDC guidelines or even reasonable safety precautions which Idaho professed to the public it would follow.  All of this shows deliberate indifference to Ron's safety and health, violating his Eighth Amendment right to be free from cruel and unusual punishment.

60. In addition, as Ammie Mabe's email shows, the inmates could have remained in Texas by extending the contract with GEO month to month until such time as the CDC approved the transfer of prisoners to other jurisdictions. Yet, despite this fact, and in direct defiance of CDC guidelines, all defendants with deliberate indifference violated Ron's Eighth Amendment rights.

61. Ron has shown both the objective and subjective components of the defendant's violation of his Eighth Amendment rights. He has shown subjective knowledge and conscious disregard of a substantial risk of serious injury by jeopardizing his present and future health, subjecting him to cruel and unusual punishment.

62. At the time of the COVID-19 pandemic and the transfer of the Idaho inmates, there were multiple instances of clearly established law imposing liability for exposing prisoners to circumstances that pose an unreasonable risk to their health. Our federal constitution, by prohibiting "cruel and unusual punishment," requires state officials to take reasonable measures to protect the people in their custody from contracting the virus. U.S. Const. Amend. VIII; see <u>Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); Helling v. McKinney, 509 U.S. 25, 35, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993).</u> This responsibility is well established. "When the state takes a person into custody and holds him there against his will, the constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being… The rationale for this principle is simple enough; when the state by affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs – e.g., food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state actions set by the Eighth

Amendment." <u>Helling, 509 U.S. at 32 (quoting DeShaney v. Winnebago County Dept of Soc. Servs., 489 US. 189, 199-200, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989); see also Hutto, 437 U.S at 678, 682.</u>

63. This exposure to COVID-19 is contrary to all current standards of decency as evidenced by the CDC guidelines, by the responses of Gov. Little to the pandemic in Idaho, by Chairman McClusky's DOC meeting attendance requirements, by the emails of IDOC officials, as well as daily coverage in the U.S. and world media regarding the COVID-19 pandemic.

64. Ron was unreasonably endangered because of the seriousness of the potential harm and the likelihood that such injury to his health by the compelled exposure to COVID-19 could be severe. At the time of transfer, it was well known that significant lung damage is one possible complication of the new COVID-19 virus. Even people with asymptomatic COVID-19 infection show signs of lung inflammation. (nature.com/articles/s41519-020-0965-6.pdf). Blood clotting from COVID-19 creates a significant risk of pulmonary embolism, which is life threatening and can lead to permanent lung damage. (pubs.rsna.org/doi/10.1148/radiol.2020201955). Up to one in five COVID-19 patients show signs of cardiac dysfunction. Research has increasingly shown that blood clotting associated with COVID-19 can lead to heart attacks. (jamanetwork.com/journals/jamacardiology/fullarticle/2763524). COVID-19 has been shown to lead to brain damage or brain injury with neurochemical evidence of astrocytic and neuronal injury commonly found. (n.neuology.org/content/early/2020/06/16/WNL.0000000000010111.abstract). Because of the high risk of blood clots, COVID-19 patients are at risk of strokes.

(nejm.org/10.1056/NEJMc2009787). In addition, Rashid Chotani, M.D., Vice President of Medical Affairs at CareLife Medical in Fairfax, VA., states, "This is a heterogeneous disease, as patients can die not only from lung failure, but also kidney failure, blood clots, liver abnormalities, and neurological manifestations."

65. All defendants, with deliberate indifference and a shocking abdication of their responsibility to keep the people in their custody, including Ron, reasonably safe from exposure to COVID-19 chose to implement a policy that violated Ron's Eighth Amendment rights. With the knowledge that they could extend their contract with GEO month to month, instead chose to transfer hundreds of inmates, including Ron, in the middle of an out of control and deadly pandemic. The defendants, the facts show, made the move with essentially no pre-planning thus violating virtually all CDC guidelines and with the awareness that the inmates present, and future health could be severely impacted. All defendants also allowed the Saguaro Correctional Center staff, despite the IDOC's stated oversight, to violate multiple CDC guidelines during quarantine. With more than a mere possibility of long-term health effects or death resulting for Ron, who resides in the high-risk category due to his age and his pre-existing high blood pressure, this deliberately indifferent behavior by the defendants was atrocious and beyond all possible bounds of decency. Ron suffered constant fear and concern for his immediate and long-term health as a result of his possible exposure to COVID-19.

66. Defendants Gov. Little, Chairman McClusky, Director Tewalt, and the IDOC, with deliberate indifference, violated Ron's Eighth Amendment right to be free from cruel and unusual punishment.

## V.    JURY DEMAND

67. Plaintiff demands a trial by jury on all claims on which he has the right to trial by jury.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.    For punitive damages for past, present and future physical and emotional pain and suffering, and other damages for a sum in excess of $75,000;

2.    For interest at the statutory rate, costs, and reasonable attorney's fees incurred by plaintiff.

RESPECTFULLY SUBMITTED on November _____ 1st, 2020.

_Ronald S. Eddington_

Ronald S. Eddington, Plaintiff